IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHRIS CEVALLOS, ET AL. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | NO. 3-08-CV-0201-BD |
| | § | |
| TOYS "R" US, INC., ET AL. | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM ORDER

Defendants Interlake Material Handling, Inc. ("IMH"), Toys "R" Us, Inc. ("TRU"), and Coast-to-Coast Installations, Inc. ("CCI") have filed separate motions for summary judgment in this strict products liability and negligence action arising out of the death of Andres Cevallos, a TRU employee, who was fatally injured when a stack of wooden pallets fell on him from a conveyor located more than 16 feet above ground level. The conveyor was part of a gravity-operated pallet-return system ("PRS") designed and manufactured by IMH, in collaboration with TRU, and installed by CCI. (*See* TRU MSJ App. at 9, 24 & CCI MSJ App. at 219-21). In their most recent complaints,[1] plaintiffs allege that the PRS was defective and unsafe for its intended use because: (1) it was not equipped with a mechanism to prevent pallets from falling off the conveyor; (2) it did not protect against or prevent reach lift trucks from coming in contact with and damaging the final brake rollers and end stops; and (3) it failed to include adequate warnings of the dangers of operating the PRS with damaged or missing brake rollers, or the dangers associated with using reach lift trucks to

---

[1] The plaintiffs in this case are Matilda Silva, the decedent's widow, and the three surviving adult children of Andres Cevallos. Although Silva and the Cevallos children are represented by different lawyers who filed separate complaints, all plaintiffs assert the same claims against defendants.

unload the PRS. (*See* Cevallos Sec. Am. Compl. at 14-16, ¶¶ 51-53; Silva Sec. Am. Compl. at 13-15, ¶¶ 53-55). Defendants now move for summary judgment as to all claims and causes of action against them. The motions have been fully briefed by the parties and are ripe for determination.

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The substantive law determines which facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). A movant who bears the burden of proof at trial must establish "beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). By contrast, a party seeking summary judgment who does not have the burden of proof at trial need only point to the absence of a genuine fact issue. *See Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). Once the movant meets its initial burden, the burden shifts to the nonmoving party to produce evidence or designate specific facts in the record showing the existence of a genuine issue for trial. *See Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). All evidence must be viewed in the light most favorable to the party opposing the motion. *See Foulston Siefkin LLP v. Wells Fargo Bank of Texas N.A.*, 465 F.3d 211, 214 (5th Cir. 2006).

A brief description of the PRS and the facts giving rise to the accident are necessary to the disposition of the pending motions. The PRS is comprised of a belt of metal rollers arranged on a downward slope leading to the edge of the mezzanine level at the TRU warehouse. (*See* Plf. Resp. App.--IMH MSJ at 126-27, 133-35). Tension "brake rollers," wrapped with friction tape, are interspersed at intervals along the conveyor to slow the speed of stacked pallets as they move along the PRS. (*Id.*). The last brake roller on the conveyor before it reaches the mezzanine is the "final

brake roller." Beyond the final brake roller is a level landing area large enough for the footprint of one pallet. (*Id.*). The rollers in the landing area are divided into three narrow strips, separated by spaces wide enough to accommodate the forks of a reach lift truck. (*Id.*). Two one-inch steel plates at the end of the landing act as the stopping mechanism for the pallets on the conveyor. (*Id.*). The PRS is designed so that employees on the mezzanine level can unload merchandise from wooden pallets and stack the empty pallets on the PRS conveyor. The stacks of empty pallets roll down the conveyor to the landing area where employees on the ground level use forklifts to reach overhead and unload the pallets from the PRS. On the day of the accident, TRU employees on the mezzanine level stacked approximately 13 empty pallets on the PRS conveyor. (*See* IMH MSJ App. at 129-31, 145-46). The stack of pallets rolled down the conveyor, but failed to stop at the landing area. (*See id.*). Instead, 12 of the 13 pallets fell from the mezzanine level and crushed Andres Cevallos who was working below. (*See id.*). After the accident, a TRU employee found the final brake roller from the conveyor on the ground floor. (*Id.* at 40). A post-accident investigation also revealed that the steel plates at the end of the landing area were bent. (*See* Plf. Resp. App.--IMH MSJ at 127, 135-36).

IMH, the company that designed and manufactured the PRS, moves for summary judgment on two broad grounds: (1) there is no evidence that the PRS was defective when it left the custody and control of IMH; and (2) substantial changes or alterations to the PRS made by TRU after delivery were the sole cause of the accident in question. The existence of a defect is an essential element common to plaintiffs' claims for strict liability, breach of implied warranty, and negligence. *See Plas-Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989) (to prevail on a products liability claim brought under a breach of implied warranty theory, plaintiff must prove that the product was defective ); *Lucas v. Texas Industries, Inc.*, 696 S.W.2d 372, 377 (Tex. 1984) (same

as to claim brought under strict liability theory); *Garrett v. Hamilton Standard Controls, Inc.*, 850 F.2d 253, 257 (5th Cir. 1988) (explaining that "although a negligence claim requires a different showing from a strict liability claim, a manufacturer logically cannot be held liable for failing to exercise ordinary care when producing a product that is not defective"). The summary judgment evidence includes reports from three experts--Dan Braswell, Frank Loeffler, and James Knorpp-- each of whom conclude that the PRS was defectively designed because it did not contain an adequate mechanism to prevent pallets from falling off the conveyor and because it failed to prevent reach lift trucks from damaging the final brake rollers. (*See* Plf. Resp. App.--IMH MSJ, Exh. D at 128-29, Exh. L at 242-43 & Exh. M at 361-62). IMH offers no evidence to the contrary. Viewed in the light most favorable to plaintiffs, this evidence at least raises a fact issue as to whether the PRS was defective and unsafe for its intended use.

Nor is IMH entitled to summary judgment on its affirmative defense that substantial alterations to the PRS made by TRU after delivery were the sole cause of the accident. Under Texas law, which provides the rule of decision in this diversity case, "[s]ubstantial alteration of a product is a type of product misuse and an affirmative defense for which the defendant bears the burden of proof." *Olympic Arms, Inc. v. Green*, 176 S.W.3d 567, 587 (Tex. App.--Houston [1st Dist.] 2004, no writ), *citing Placencio v. Allied Industries International, Inc.*, 724 S.W.2d 20, 22 (Tex. 1987). In its brief, IMH contends that TRU altered or modified the PRS by: (1) replacing the brake rollers; (2) repositioning the middle arm of the PRS in the landing area so that it was not parallel to the other arms; (3) removing an additional roller between the final brake roller and the landing area; and (4) damaging the final brake roller and end stops on the conveyor. (*See* IMH MSJ Br. at 15, 17-18). The first two alterations are not relevant to plaintiff's theory of the case. Plaintiffs do not allege that the defective design of the brake rollers, other than the final brake roller, or the middle arm of the

PRS caused the accident in question. Rather, their theory focuses on the stopping mechanism at the end of the PRS, and the whether the PRS should have been designed so that the extenders on reach lift trucks could not come in contact with or damage the final brake rollers. Thus, any alterations made by TRU to the brake rollers, other than the final brake roller, or to the middle arm of the PRS in the landing area will not defeat plaintiffs' claims. *See Muth v. Ford Motor Co.*, 461 F.3d 557, 563 (5th Cir. 2006) (for alteration to affect defendant's liability, alteration must be relevant to plaintiff's theory of defect).

With respect to the alleged removal of an additional roller between the final brake roller and the landing area, the evidence fails to conclusively establish that the PRS contained such a roller when it was delivered to TRU. The Installation Drawings relied on by IMH, which purportedly show the additional roller, (*see* IMH MSJ App., Tab E), lack any reliable indicia identifying them as "final" drawings. (*See* Plf. Resp. App.--IMH MSJ at 29, 46). Indeed, IMH's own representative could not identify the drawings as such. (*Id.* at 35, 46). Nor are the photographs provided by IMH sufficient to prove that the PRS had an additional roller in front of the final brake roller when the system was delivered to TRU. These photographs depict a conveyer in the TRU warehouse that transports loaded pallets "inbound," or away from the mezzanine, rather than the conveyer involved in the accident made the basis of this suit, which carries empty pallets "outbound," or towards the mezzanine. (*See* IMH MSJ Br. at 17-18). Because the photographs do not bear directly on the product at issue, they are insufficient to carry IMH's burden of proof at the summary judgment stage.

A fact question also exists as to whether damage to the final brake roller and end stops was foreseeable. "Alterations or modifications not reasonably foreseeable by the manufacturer or seller are sufficient to preclude imposition of liability." *Olympic Arms*, 176 S.W.3d at 587, *quoting USX Corp. v. Salinas*, 818 S.W.2d 473, 489 n.16 (Tex. App.--San Antonio 1991, writ denied). There is

evidence in the summary judgment record that reach lift trucks similar to those suspected of damaging the PRS were present at the TRU warehouse at the time the system was installed, (*see* Plf. Resp. App.--IMH MSJ at 96, 102), and that IMH knew or should have known that TRU used reach lift trucks to unload the PRS. (*Id.* at 108-09). IMH also knew that forklifts would come in contact with the PRS. (*Id.* at 38-39). An IMH representative, Bob McGonagle, admitted that the PRS would be "flawed" and "defective" if the forks of a reach truck or a forklift could reach the brake roller. (*See id.* at 200). In view of this evidence, the court determines that IMH is not entitled to summary judgment on its affirmative defense of substantial alteration.

TRU moves for summary judgment on the sole ground that there is no evidence of gross negligence.[2] Texas law defines "gross negligence" as an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (Vernon 2008). The first element, "extreme risk," means a "likelihood of serious injury to the plaintiff." *Lee Lewis Construction, Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001) (citing cases). The second element, "actual awareness," means that "the defendant knew about the peril, but its acts or omissions demonstrated that it did not care." *Id.* (citing cases). Circumstantial evidence is sufficient to prove either element. *Id.*

---

[2] Because plaintiffs, as the legal beneficiaries of Andres Cevallos, recovered worker's compensation benefits following his death, such recovery is the exclusive remedy against his employer, TRU. *See* TEX. LAB. CODE ANN. § 408.001(a) (Vernon 2006). However, the statute "does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused by an intentional act or omission of the employer or by the employer's gross negligence." *Id.*, § 408.001(b).

Although the court questions whether plaintiffs can meet their heavy burden of proving gross negligence by "clear and convincing evidence" at trial, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a), there is enough evidence to preclude summary judgment. In particular, the summary judgment evidence shows that TRU knew approximately one month before the fatal accident that reach lift trucks had damaged the last brake roller on a PRS conveyor. (*See* TRU MSJ App. at 36-37 & 52-53). Michael Rasco, a facility manager at the TRU warehouse, twice noted stacks of empty pallets leaning "abnormally out over the aisle" from a conveyor on the mezzanine level with the final brake roller missing. (*See* Plf. Resp. App.--TRU MSJ at 38-39, 40-41). At his deposition, Rasco acknowledged that "[t]he pallets had been leaning where they could possibly fall and another stack could knock them off." (*Id.* at 46). Tom Lewandoski, Director of Distribution Engineering for TRU, also recognized the danger posed by pallets falling off the PRS and onto the ground 16 feet below. (*See id.* at 13). Yet no one at TRU reported these safety issues to an in-house committee, consulted an engineer about the problem, or made any changes to the PRS before the accident in question. The company's sole response was to instruct its employees how to operate reach lift trucks so as to avoid contact with the brake rollers on the conveyors. (*See id.* at 45-46). When viewed in the light most favorable to plaintiffs, this evidence raises a genuine issue of material fact as to whether TRU had actual awareness of the likelihood of serious injury to its employees, but "did not care."[3]

The court reaches a different conclusion with respect to plaintiffs' breach of implied warranty, negligence, and gross negligence claims against CCI--the company that installed the PRS. As a

---

[3] In its reply brief, TRU objects to certain evidence submitted by plaintiffs as part of their summary judgment response, including James Knorpp's expert report and Tommy George's deposition testimony. (*See* TRU MSJ Reply at 1-2). Although the court relied on the Knorpp report and the George deposition in deciding IMH's motion for summary judgment, IMH has not objected to this evidence. None of the evidence was considered by the court in deciding TRU's motion for summary judgment. Consequently, the objections are overruled as moot. *See Continental Casualty Co. v. St. Paul Fire & Marine Insurance Co.*, No. 3-04-CV-1866-D, 2006 WL 984690 at *1 n.6 (N.D. Tex. Apr. 14, 2006) (overruling as moot objections to evidence that is not considered by the court in deciding motion for summary judgment).

preliminary matter, the court notes that CCI is not a statutory "seller," as that term is defined by Texas law. Indeed, plaintiffs concede as much in their response. (*See* Plf. Resp.--CCI MSJ at 1-2, ¶ 2). CCI is therefore entitled to summary judgment as to plaintiffs' breach of implied warranty claim. *See Arceneaux v. Lykes Bros. Steamship Co.*, 890 S.W.2d 191, 196 & n.2 (Tex. App.--Beaumont 1994, writ denied) (under Texas law, only actual sellers are liable for breach of warranty).

To establish negligence, plaintiffs must prove, *inter alia*, that CCI owed a legal duty to TRU employees. *See Federal Savings & Loan Ins. Corp. v. Texas Real Estate Counselors, Inc.*, 955 F.2d 261, 265 (5th Cir. 1992), *citing El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) (legal duty is essential element of negligence claim under Texas law). Plaintiffs argue that such a duty exists under the Master Installation Agreement between CCI and IMH which provides, in pertinent part:

> [CCI] warrants to [IMH] that all materials and equipment will be installed in accordance with the Contract Documents and with accepted industry practices (unless contrary to the Contract Documents), and that all work will be of good quality and free from defects. [CCI] will notify [IMH] of any conflict between the Contract Documents and accepted industry practice.

(Plf. Resp. App.--CCI MSJ at 336, § 11.1). Contrary to plaintiffs' assertion, this language does not require CCI to ensure that the PRS meets industry safety *standards*. (*See* Plf. Resp.--CCI MSJ at 12). Instead, the plain language of the Agreement requires only that the installation services provided by CCI be in accordance with accepted industry *practices*. Further, when read in its entirety, the Agreement unambiguously limits CCI's role to providing installation services for various projects designed by IMH in accordance with the terms of an Installation Manual provided by IMH. Nothing in the Agreement suggests that CCI had any input in or responsibility for the safe design of

any IMH projects.[4] "The Court will not infer such responsibility when it does not appear on the face of the contract." *Muniz v. Ransomes America Corp.*, 921 F.Supp. 438, 442 (S.D. Tex. 1995), *aff'd*, 81 F.3d 154 (5th Cir. 1996).

Nor did CCI voluntarily assume any duty to inspect the PRS for possible defects by virtue of its contract with IMH. Not only is there no evidence of such a voluntary undertaking, but there can be no liability under this negligence theory "if a defendant has a contractual obligation to perform the service at issue[.]" *Coachmen Industries, Inc. v. Willis of Illinois, Inc.*, 565 F.Supp.2d 755, 777 (S.D. Tex. 2008). The existence of the Master Installation Agreement between CCI and IMH undermines this theory of recovery. *Id.*; *see also Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 598-99 (Tex. App.--Ft. Worth 2008, pet. denied), *cert. denied*, 129 S.Ct. 1032 (2009) ("We will not disregard the plain language of the contract that clearly defines the scope of the [defendant's] duty merely because [plaintiff] argues that the voluntary undertaking doctrine applies.").

Finally, plaintiffs have failed to adduce any evidence of gross negligence on the part of CCI. When asked at his deposition if he had any evidence to suggest that CCI knew of any design problems with the PRS at the time the system was installed, plaintiffs' expert, Frank Loeffler, answered "No." (*See* CCI MSJ App. at 235). In light of this testimony, plaintiffs cannot demonstrate that CCI had actual awareness of any risks presented by the PRS. *See Diamond Shamrock Refining Co. v. Hall*, 168 S.W.3d 164, 171-72 (Tex. 2005).

---

[4] To the extent plaintiffs argue that CCI had a common law duty to inspect the PRS and warn TRU of "obvious" defects, (*see* Plf. MSJ Resp. at 14-15), their argument is misplaced. Under Texas law, there is no duty to warn of risks that should be obvious to foreseeable users. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995).

## **CONCLUSION**

For these reasons, CCI's motion for summary judgment [Doc. # 212] is granted. All claims against this defendant are dismissed with prejudice. IMH's motion for summary judgment [Doc. #210] and TRU's motion for summary judgment [Doc. # 215] are denied. Plaintiffs' claims against those defendants will proceed to trial on May 3, 2010.

SO ORDERED.

DATED: February 26, 2010.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE